IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

WILLIS M. CRUTCHFIELD                                              PLAINTIFF

vs.                                  CIVIL NO. 05-4033

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION            DEFENDANT

## MEMORANDUM OPINION

Willis Crutchfield (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed on August 13, 2002, and July 26, 2002, respectively, alleging an onset date of July 2, 2002,[1] due to sleep apnea, diabetes mellitus, hypertension, back pain, and right leg pain. (Tr. 50-52, 308-310). An administrative hearing was held on July 9, 2004. (Tr. 387-422). Plaintiff was present and represented by counsel.

At the time of the administrative hearing on July 9, 2004, plaintiff was forty-six years old and possessed a high school education. (Tr. 15, 92, 394). The record reveals that he had past relevant work ("PRW"), as a fork lift operator. (Tr. 15, 78, 419).

On December 1, 2004, the Administrative Law Judge ("ALJ"), issued a written opinion

---

[1] SSI benefits may not be awarded for a date prior to the application date. *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989).

AO72A
(Rev. 8/82)

finding that plaintiff's sleep apnea, diabetes, hypertension, back pain, and shoulder pain were severe, but they did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 19). Further, he determined that plaintiff's physical impairments were non-severe. After discrediting plaintiff's subjective allegations, the ALJ concluded that plaintiff maintained the residual functional capacity ("RFC"), to perform a full range of medium work. He then determined that plaintiff's PRW as a fork lift operator did not require the performance of work-related activities precluded by his RFC. (Tr. 19).

On March 26, 2005, the Appeals Council declined to review this decision. (Tr. 5-8). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 5, 6).

**Evidence Presented:**

In 1998, plaintiff was diagnosed with diabetes and prescribed oral medications. (Tr. 161). Then, on August 4, 1998, plaintiff was involved in an automobile accident, resulting in back pain. (Tr. 163). However, x-rays of plaintiff's cervical and dorsal spines were normal. (Tr. 163).

On May 15, 2001, plaintiff underwent a sleep study, and was diagnosed with severe mixed obstructive and central sleep apnea syndrome and nocturnal hypoxemia. (Tr. 116). Dr. Christopher Bailey recommended that he be treated with a bi-level positive airway machine (BiPAP), and supplemental oxygen. A second sleep study was performed on July 7, 2001. Plaintiff was again diagnosed with obstructive sleep apnea. (Tr. 109-115). Dr. Bailey strongly recommended that

plaintiff be treated via nocturnal continuous positive airway pressure ("CPAP"). (Tr. 109). By October 2001, plaintiff was reportedly sleeping better. (Tr. 123).

In March 2002, records reflect that plaintiff was non-compliant with both his hypertension and diabetes medications. (Tr. 188). In May 2002, plaintiff was not taking the Avandia that had been prescribed to treat his diabetes. (Tr. 186). He indicated that he did not have the money to purchase this medication. Dr. Jon Maxwell advised plaintiff that he needed to get "serious" about his illness. (Tr. 186).

On July 2, 2002, plaintiff sought treatment for swelling in his left hand. (Tr. 186). Dr. Maxwell's treatment notes reveal that plaintiff's left hand was warm to the touch, and swollen along the dorsal aspect. However, there were no reports of trauma and no open sores. Dr. Maxwell diagnosed plaintiff with cellulitis, and prescribed Cipro and Lortab. (Tr. 186).

On July 8, 2002, x-rays of plaintiff's left hand revealed soft tissue swelling over the dorsum of the hand. (Tr. 135). However, no underlying fracture or dislocation was demonstrated. (Tr. 135). An examination revealed continued swelling, but the swelling was not as "diffuse," and had settled over his third metacarpal. (Tr. 183).

On July 15, 2002, plaintiff's left hand continued to be swollen. (Tr. 183). However, it was noted that the swelling seemed to "come and go." Dr. Maxwell advised plaintiff to use heat and apply rubbing alcohol. After prescribing Keftin, he then referred plaintiff to another physician. (Tr. 183).

This same date Dr. Maxwell completed an attending physician's statement. (Tr. 184-185).

3

He diagnosed plaintiff with cellulitis of the left hand, indicating that plaintiff's symptoms included pain and swelling in the left hand. (Tr. 184). Dr. Maxwell also noted that plaintiff had erythema and soft tissue swelling in the dorsal area of his left hand. He stated that his treatment plan included systemic antibiotics, elevation and heat, and restrictions concerning plaintiff's repetitive use of his left hand. (Tr. 185). Dr. Maxwell also indicated that plaintiff should not climb. However, he noted that plaintiff could return to work on August 2, 2002. (Tr. 185).

On July 21, 2002, plaintiff was hospitalized due to bilateral arm and atypical substernal chest pain with associated shortness of breath. (Tr. 244). A chest x-ray was normal, as was an EKG. (Tr. 244, 289). In fact, a cardiac examination revealed a regular heart rate and rhythm without murmurs, rubs, or gallops. (Tr. 248, 254, 268). Accordingly, plaintiff was released on July 22, 2002, and was told to resume his pre-admission medications. (Tr. 246). The doctor also prescribed Augmentin for cellulitis in the right forearm. (Tr. 254).

On July 30, 2002, plaintiff first sought treatment for a back injury. (Tr. 172). He indicated that he had slipped off of a ladder and fallen about two feet to the ground. His symptoms included lower back pain, left lower extremity pain and numbness, neck stiffness, and light headedness. Records indicated that he ambulated into the chiropractic clinic without assistance, and changed positions without very significant difficulty. X-rays of plaintiff's lumbar spine were unremarkable, as were x-rays of his thoracic spine. (Tr. 134). On examination, Dr. Marc Hagebusch, a chiropractor, noted that plaintiff had a severely restricted range of motion with pain in his lumbar spine. (Tr. 172). He also demonstrated severe lower thoracic and lumbar paraspinal muscular

4

spasms and a reduced intersegmental range of motion at the T10-L1 level and throughout his lower lumbopelvic spine, with associated very severe palpatory tenderness. In addition, plaintiff had a reduced intersegmental range of motion from the C6-T2 level with associated palpatory tenderness. In fact, the left side supine and seated straight leg raise test caused plaintiff increased lower back pain. Dr. Hagebusch diagnosed plaintiff with lumbar sprain, paresthesias, thoracic sprain, cervical segmental dysfunction, and dizziness. (Tr. 173). He then prescribed treatment to include manipulation utilizing fast stretch modalities and proper coupled reductive manipulations to the articulations and associated soft tissue musculature that were demonstrating deficiencies of movement; ice or moist heat packs placed on the spine; and, interferential current at 90-120 Hz subthreshhold placed paraspinally over the cervical, thoracic, and lumbar spines, as clinically indicated. Plaintiff was also given home care recommendations regarding spinal stretching and strengthening exercises, in addition to behavioral modifications and ergonomic information to further speed recovery and prevent exacerbations. (Tr. 172, 174).

In August 2002, an MRI of plaintiff's lumbar spine was normal. (Tr. 173). Then, on November 8, 2002, Dr. Hagebusch released plaintiff to return to light duty work. (Tr. 175). He indicated that plaintiff should lift no more than thirty pounds for at least two weeks. (Tr. 175). By January 15, 2003, plaintiff was reporting no difficulties in performing normal activities of daily living and no symptoms. (Tr. 173-174). His movements were unguarded and he ambulated with no apparent difficulty. Plaintiff demonstrated no difficulty changing positions; a good range of motion in the cervical, thoracic, and lumbar spines; and, no increased pain or symptoms with straight leg

5

raise testing. As such, no further care was necessary. (Tr. 174).

On August 8, 2002, plaintiff's lab results revealed a two to three month average blood glucose level of 9.5, which was above average. (Tr. 181). As such, Dr. Maxwell noted that plaintiff's diabetes remained out of control. At this time, Dr. Maxwell suspected, and plaintiff admitted that he was not following his diabetic diet. (Tr. 181).

On September 24, 2002, plaintiff reported that he had not been exercising or eating right. Plaintiff indicated that this was due to increased stress relating to his finances. (Tr. 178). He stated that he did not have any income, aside from the money he was able to earn at odd jobs. Dr. Maxwell prescribed a strict diet and exercise routine, opining that insulin would be necessary if control was not achieved. He also prescribed Amaryl and Avandia. (Tr. 178).

On January 7, 2003, plaintiff requested samples of Amaryl and Accupril. (Tr. 178). Dr. Maxwell indicated that he did not have any samples, and noted that plaintiff had been noncompliant with his follow-ups and medication. As such, Dr. Maxwell stated that he would not be willing to treat plaintiff, if he did not follow-up as he had been advised. (Tr. 178).

On January 13, 2003, plaintiff reported being out of medication. (Tr. 177). In fact, he stated that he had been out of his blood pressure medication for at least one month, due to his inability to afford a medication refill. Dr. Maxwell diagnosed plaintiff with hypertension and diabetes, advised him to discontinue the Accupril, and gave him samples of Teventin. He also prescribed Amaryl, and gave plaintiff samples of Avandia. (Tr. 177).

On February 4, 2003, Dr. Jon Maxwell completed a cardiac assessment. (Tr. 176). He

6

indicated that plaintiff suffered from substernal pain and pain in the left side of the sternum. Plaintiff's pain was described as a "tightness." Dr. Maxwell indicated that plaintiff's pain was not exertional, and could occur at any time. Further, it was not brought on by deep breathing, eating, twisting/moving, or palpation of the chest wall. Records indicate that the pain was not relieved by Nitroglycerine, but was decreased via rest. Although a treadmill stress test had not been performed on plaintiff, Dr. Maxwell stated that one could be safely performed. (Tr. 176).

On February 18, 2003, plaintiff underwent a general physical exam. (Tr. 207-213). He complained of sleep apnea, a back injury, shoulder pain, vision problems, a four to five year history of diabetes, and a heart attack in July 2002. (Tr. 207). An examination was unremarkable, revealing a normal heart rate and rhythm, normal gait, normal range of motion in all areas, no muscle atrophy, no muscle abnormalities, and no muscle weakness. (Tr. 210). As such, plaintiff was diagnosed with poorly controlled diabetes and hypertension. (Tr. 213). However, no limitations were noted. (Tr. 213).

On February 21, 2003, Dr. Ivory Kinslow treated plaintiff for complaints of blurry vision in both eyes. (Tr. 214). Plaintiff indicated that this condition had worsened over the last several years. On examination, he was able to maneuver around the office without difficulty. His best vision was 20/30 in the right eye and 20/40 in the left. The intraocular pressures were thirteen in the right eye and sixteen in the left. An examination of plaintiff's eye lids, pupils, muscle balance, and motility was unremarkable. On dilation, plaintiff's lens showed a trace cortical cataract in the right eye and 1+ cortical cataract in the left eye. Accordingly, Dr. Kinslow diagnosed him with minimal cataracts

in both eyes. Although he noted that plaintiff was diabetic, he found no evidence of diabetic retinopathy. (Tr. 214).

On March 28, 2003, plaintiff sought emergency treatment for sleepiness and general malaise. (Tr. 227). He also complained of a decreased appetite and elevated blood sugar level. Records indicate that plaintiff had been using his Bi-level positive airway pressure machine ("BiPap"), fairly consistently when sleeping, but that he had not used it over the previous twenty-four hours. He reported that he was also out of Amaryl because he had lost his job and was unable to afford it.[2] Laboratory testing revealed a glucose level of 247 with a slightly elevated ammonia level. However, the only abnormality noted was sleep apnea with a slightly elevated carbon dioxide level. Thus, Dr. Henry Platt diagnosed plaintiff with hyperglycemia and sleep apnea, and then directed him to use his BiPap machine anytime he slept. In addition, due to plaintiff's financial situation, plaintiff's Amaryl was replaced with a less expensive drug called Sulfonyurea. (Tr. 230).

On June 10, 2003, plaintiff indicated that he was out of medication, and had no money to see his doctor. (Tr. 236). He presented at the emergency room stating that the mask for his BiPap machine caused nasal irritation, and that he needed some ointment to soothe the irritation. An examination revealed a dried rash on the bridge of his nose. Although plaintiff also reported blurred vision, no objective findings were noted. The doctor diagnosed plaintiff with sleep apnea and diabetes. His glucose level was noted to be 491. As such, plaintiff was prescribed Amaryl, Avandia,

---

[2]This is all that is contained in the record concerning plaintiff's statement about losing his job. It is unclear whether he meant that he had worked since his onset date and only recently lost his job, or if he was merely referring to the fact that he had lost his job prior to his alleged onset date, rendering him unable to purchase his medications.

8

and some medication to treat the rash on his nose. (Tr. 237). Records indicate that plaintiff was able to get his medications with the assistance of a social worker. (Tr. 242).

On January 9, 2004, plaintiff fell and hit his head, resulting in a near syncopal episode. (Tr. 293). Again, plaintiff indicated that he had not been taking his diabetes or hypertension medications. At the time of his evaluation, plaintiff indicated that he felt much better. Aside from an elevated glucose level and blood pressure readings, his examination was unremarkable. A CT scan of his brain was normal, as was a chest x-ray. (Tr. 298-299). Further, an EKG revealed sinus rhythm, but was otherwise unremarkable. (Tr. 300).

On September 29, 2004, plaintiff was again treated for chest pain. (Tr. 319). Records reveal that plaintiff continued to be non-compliant with his medication reportedly due to financial problems. (Tr. 324). However, he reported smoking two packages of cigarettes per day. A cardiolyte myocardial perfusion study revealed dilated cardiomyopathy and an ejection fraction rate of only twenty percent. (Tr. 345). Further, a nondiagnostic maximal treadmill stress test showed fair exercise tolerance, and hypertension with rest with further hypertensive response to exercise. (Tr. 346). Plaintiff was restarted on Amaryl, Accupril, and sliding scale insulin. (Tr. 329). On September 30, 2004, he was released home in stable condition. (Tr. 380).

At this time, records reveal that plaintiff was not using his CPAP machine as prescribed. (Tr. 329). As such, he was encouraged to do so. (Tr. 329).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevent him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

10

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a

11

matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff has alleged a variety of disabling impairments, including sleep apnea, diabetes mellitus, hypertension, back pain, right leg pain, and chest pain. While we are cognizant of the fact that plaintiff was diagnosed with sleep apnea in May and July 2001, we also note that plaintiff's sleeping habits had improved by October 2001. (Tr. 109-115, 116). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). Further, the medical records dated after this time revealing sleep related problems show that plaintiff was not using his BiPAP and CPAP machines as prescribed. (Tr. 227, 329). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). As such, we cannot say that his condition was disabling.

We also note that plaintiff has been diagnosed with uncontrolled diabetes mellitus and hypertension. However, the record reveals that plaintiff has been consistently non-compliant with his medication and treatment. *See id*. Plaintiff did not take his medication as prescribed, did not follow his diabetic diet, failed to exercise as directed, and failed to follow-up with his doctor on a regular basis. (Tr. 177, 178, 181, 186, 188, 227, 319). Although he contends that his non-compliance is excused by his financial situation, this assertion is belied by the fact that the record reveals that plaintiff reported smoking two packages of cigarettes per day. (Tr. 177, 230, 242, 324). In addition, he has not attempted to obtain assistance from any facilities offering low-cost or indigent care. *Riggan v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that although plaintiff claimed he

AO72A
(Rev. 8/82)

could not afford medication, there was no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication); *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir.1995) (plaintiff's allegations of financial hardship can be discredited by evidence of her ability to afford other expenses). Accordingly, we do not find his non-compliance to be the result of his financial state.

As for plaintiff's back and leg pain, the evidence reveals that plaintiff sought chiropractic treatment for a back injury in July 2002. *See Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998) (holding that fact that claimant had not undergone surgery and relied on conservative treatment weighed against his subjective complaints); *Robinson v. Sullivan,* 956 F.2d 836, 840 (8th Cir. 1992) (noting that fact that all doctors who treated plaintiff prescribed conservative treatment did not support plaintiff's contention of disability). Although plaintiff's initial examination documented range of motion limitations, an MRI and x-rays of plaintiff's lumbar and thoracic spines were unremarkable. (Tr. 134, 172-174). Further, by January 2003, chiropractic progress notes revealed that plaintiff no longer had these limitations, and no longer required treatment. (Tr. 174). *See Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999) (holding that lack of physician imposed limitations weighs against credibility). Further, in February 2003, a general physical examination revealed no abnormalities. (Tr. 210). In fact, at the administrative hearing, plaintiff testified that he took no pain medication. (Tr. 398-399, 405). Then, in September 2004, plaintiff again reported taking no medications. (Tr. 328). *See Haynes v. Shalala*, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication was inconsistent with disabling pain); *Rankin v. Apfel*, 195 F.3d 427, 429

13

(8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints). As such, we cannot say that plaintiff's condition is disabling.

Plaintiff also suffered from chest pain. Although he contends that he suffered from a heart attack in July 2002, the record does not support this assertion. He was treated for chest pain at this time, but was found to have an unremarkable cardiac examination with a normal EKG and chest x-ray. (Tr. 248, 254, 268). Plaintiff did not again seek medical attention for this condition until September 2004. (Tr. 319). At that time, a myocardial perfusion study revealed dilated cardiomyopathy and an ejection fraction rate of twenty percent. (Tr. 345). However, blood work twice revealed normal cardiac enzymes, and a stress test revealed nothing more than hypertension.[3]

While we note that plaintiff did have an ejection fraction rate of twenty percent, we can find no evidence to show that his ejection fraction rate was this low prior to, or after this date. In fact, aside from plaintiff's treatment for chest pain in 2002, there is no other indication in the record that plaintiff complained of or experienced chest related problems. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). Thus, there is no evidence to indicate that plaintiff has suffered from a disability related to this impairment for the requisite one year period. *See Titus*, 4 F.3d at 594. In addition, there is nothing to suggest that plaintiff's activities have been limited in any way by this condition. The record contains no physician imposed restrictions. *See Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997). In fact,

---

[3]As discussed above, plaintiff's hypertension remained out of control because he failed to take his medication.

in February 2003, Dr. Maxwell indicated that plaintiff could safely undergo a stress test, and he did so in September 2004, with unremarkable results. (Tr. 176, 319, 324). *See* 20 C.F.R. Pt. 404, subpart. P, App. 1, § 4.04 (holding that listings require a left ventricular ejection fraction rate of thirty percent or less and a cardiologist's conclusion that the performance of an exercise test would present a significant risk to the individual).

We also note that plaintiff applied for, and collected, unemployment benefits, which suggests that he is not disabled. (Tr. 396). The United States Court of Appeals for the Eighth Circuit has held that "a claimant may admit an ability to work by applying for unemployment compensation because such an applicant must hold himself out as available, willing, and able to work." *Johnson v. Chater*, 108 F.3d 178, 180-181 (8th Cir. 1997) (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991)). Thus, plaintiff's receipt of unemployment benefits suggests that he was able to work during this time frame.

Plaintiff's own reports concerning his activities of daily living also contradict his claim of disability. On August 10, 2002, plaintiff completed a supplemental interview outline indicating his ability to care for his personal hygiene, take out the trash, shop for groceries and clothing, go to the bank and post office, prepare frozen dinners, count change, drive, attend church, watch television, listen to the radio, and visit friends and family. (Tr. 72-73). The record also contains another undated outline showing that plaintiff could do the laundry, wash dishes, iron, pay the bills, and use a checkbook. (Tr. 57-58). *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003)(holding that plaintiff was able to perform many of the activities associated with daily life); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go

AO72A
(Rev. 8/82)

to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). These are not the type of activities a totally disabled person would be able to perform.

Therefore, although it is clear that plaintiff suffers from some degree of pain, he has not established that he is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Further, we can find no reason to discount the ALJ's decision to dismiss the testimony of plaintiff's friends, Susan French and Taressia Duke. (Tr. 408-417). It is clear that their testimony merely corroborated plaintiff's testimony. Therefore, the same evidence that supported discounting plaintiff's testimony also supported discounting the testimony of the lay witnesses. *Wheeler v. Apfel*, 224 F.3d 891, 896 (8th Cir. 2000). Because the determination as to the weight given to witness

16

statements was clearly within the ALJ's province, we find no error in his credibility determination. *See Siemers*, 47 F.3d at 302; *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a full range of medium work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessment of a non-examining agency medical consultant, a general physical examination, plaintiff's subjective complaints, and his medical records. On March 5, 2003, Dr. Robert Redd, a non-examining, consultative physician, completed an RFC assessment. (Tr. 216-225). After reviewing plaintiff's medical records, he determined that

17

plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally, as well as sit, stand, and walk for six hours out of an eight-hour workday. (Tr. 217).

As discussed above, the medical evidence does not indicate that plaintiff was suffering from any limitations that would prevent him from performing medium work. Although he did have problems with his back for approximately six months, the evidence shows that plaintiff's condition was treated without residual limitations. (Tr. 173-174). Physical examinations and objective testing have revealed no abnormalities. (Tr. 134, 173, 207-213). Further, plaintiff has admitted to taking no pain medication for any alleged residuals of this condition. (Tr. 398-399).

While we do note that plaintiff was diagnosed with a heart condition in September 2004, it is significant to point out that there is no evidence in the record to show that plaintiff's activities have been limited by his physicians prior to or after this diagnosis. (Tr. 176, 244-268, 319-324). In fact, in his cardiac assessment dated February 2003, Dr. Maxwell did not report any work-related limitations. (Tr. 176). He even stated that a treadmill stress test could be safely performed. (Tr. 176). Likewise, there is no indication that plaintiff has reported any self imposed restrictions to his doctors. *See Jones*, 122 F.3d at 1152 (holding that a lack of medically ordered restrictions weighs against credibility); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (same). Therefore, based on the evidence of record, we find substantial evidence supports the ALJ's RFC determination.

Because the ALJ properly considered and dismissed plaintiff's subjective complaints after reviewing the evidence of record, he was not required to consult with a vocational expert. *Reynolds v. Chater*, 82 F.3d 254, 258-259 (8th Cir. 1996) (holding that when the ALJ properly discredits the

claimant's complaint of a nonexertional impairment, he is not required to consult with a vocational expert, and may properly rely on the vocational guidelines at step five). In spite of this, however, the ALJ did call a VE to testify regarding plaintiff's PRW. The VE testified that the forklift operator job was semi-skilled, medium level work. (Tr. 419). Thus, given the fact that the evidence does not support plaintiff's contention that his medical condition resulted in impairments that rendered him incapable of performing a full range of medium work, we find that the ALJ's opinion is supported by substantial evidence.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 16th day of May 2006.

/s/ Bobby E. Shepherd
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)